**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RUPLE BUILDERS, INC.,** | : | |
| **Plaintiff and** | : | **No. 2:17-cv-00004** |
| **Counterclaim-Defendant** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **BRACKENRIDGE CONSTRUCTION** | : | |
| **CO., INC.,** | : | |
| **Defendant and** | : | |
| **Counterclaim-Plaintiff** | : | |

## MEMORANDUM

Before the Court is Defendant Brackenridge Construction Company ("Defendant")'s

motion for summary judgment. (Doc. No. 42.) For the reasons that follow, the Court will grant

the motion.

## I.     BACKGROUND

### A.     Factual Background[1]

### 1.     The Subcontract and Its Relevant Provisions

Plaintiff and Defendant entered into a "Subcontract for Construction Services" (the

"Subcontract") on May 9, 2016 (Doc. No. 53 ¶ 1), "for the construction of a pre-fabricated

---

[1] Unless otherwise noted, the following relevant facts of record are derived from the joint concise statement of material facts submitted by Defendant on December 28, 2017 (Doc. No. 53), which incorporates the parties' respective statements of material facts (Doc. Nos. 43, 51). The Court additionally notes that in certain instances in which the parties dispute a certain factual statement, the Court has cited directly to the record as to that specific point. Further, in circumstances in which Plaintiff does not specifically deny a factual assertion in its responsive statement of material facts, as required by Local Rule 56(C)(1)(a), the Court deems the statement admitted. See LCvR56E (providing that factual statements will be deemed admitted unless specifically denied).

In addition, in instances where Plaintiff relies on one of the paragraphs of the Declaration challenged by Defendant in its motion to strike (Paragraphs 4, 5, 6, 10, and 16) (Doc. No. 55), the Court disregards the subject paragraphs of the Declaration for purposes of resolving the instant motion for summary judgment, in accordance with its Memorandum and Order disposing of Defendant's motion to strike and for sanctions.

Dollar General store located at 16015 Lake Shore Blvd., Cleveland, Ohio[,] 44110" (the "Project") (id. ¶ 2). The Subcontract contemplated that Plaintiff and Defendant would act as the Subcontractor and Contractor, respectively. (Id. ¶ 1.) "Pursuant to the Subcontract, [Plaintiff] was to provide all labor, materials, and supervision to erect a pre-engineered metal building system at the Project site." (Id. ¶ 3.)

Article 3.1 of the Subcontract, which pertains to the "Contract Sum," provides that "[t]he sum to be paid by Contractor to the Subcontractor for the Subcontractor's performance and completion of the Subcontractor's [w]ork as well as all of the duties, obligations, and responsibilities of the Subcontractor under this Agreement . . . shall be Fifty Seven Thousand Five Hundred and 00/100 Dollars." (Doc. No. 1-2 at 4.) In addition, Article 6.2, which relates to "Field Orders – Additions/Deductions," reads, in relevant part, as follows:

> All extra work shall be done according to the provisions relating to the original Subcontractor's [w]ork and shall only be done at the written order of Contractor; otherwise no charge may be made or collected therefore. The Subcontractor agrees that it has waived its rights to seek an increase in the Lump Sum Contract Price for any item of work and/or materials which were performed, installed or supplied prior to the date of the written request for a [c]hange [o]rder with respect to such work and/or materials. The Subcontractor specifically acknowledges and agrees that no other employee, agent, representative, or officer of [c]ontractor has apparent, implied, or express authority to authorize any change order or authorization for any payment beyond the [c]ontract [s]um.

(Id. at 6.)

Moreover, in the portion of the Subcontract providing for the "maintenance of [the] work schedule," Article 2.7 states that unless otherwise noted elsewhere in the Subcontract, "the Subcontractor . . . shall furnish in writing to the Contractor the names of persons or entities who are to furnish materials, supplies or equipment . . . proposed for each portion of the [w]ork where the expected value of the materials, supplies or equipment is over $2,500.00." (Id. at 3.) In addition, Article 12.3 states that "[t]he Subcontractor shall not assign or subcontract the

Subcontractor's [w]ork or any part thereof without the specific written consent of Contractor."

(Id. at 9.) As to any potential amendments to the Subcontract, Article 22.2 states that "[n]o

amendment, alteration, modification or waiver of this Agreement shall be valid or enforceable

unless in writing and duly executed by either the Senior Vice President or President of

Contractor." (Id. at 13.) John Ruple ("Ruple"), Plaintiff's President, agreed to the

aforementioned provisions and signed the Subcontract on behalf of Plaintiff. (Id. at 14, Doc. No.

53 ¶ 6.)

### 2. Field Order and Retention of the Chagrin Valley Steel Erectors to Perform Work on the Subcontract

Defendant states that on July 12, 2016, it entered "a deduct field order" in the amount of

$18,496.00 for purposes of decreasing the lump sum price under the Subcontract for that

amount.[2] (Doc. No. 53 ¶ 10.) Defendant's stated reason for such a reduction is that a third-party

subcontractor was paid this amount to install a panel system in relation to the Project – work that

"was originally within [Plaintiff's] scope of work under the Subcontract" – and that in light of

the third-party subcontractor's performance, "the $18,496.00 paid to [the third-party

subcontractor] was no longer owed to [Plaintiff] for its remaining scope of work under the

Subcontract."[3] (Id. ¶ 11.) On June 20, 2016, after receiving Plaintiff's first pay application in

the amount of $4,500.00, Defendant paid Plaintiff that amount, which Defendant states resulted

---

[2] Plaintiff denies this factual statement on the basis that, as stated by Ruple in his Declaration, Plaintiff "never received a deduct field order in the amount of $18,496.00 from [Defendant]." (Doc. No. 51 ¶ 10.) While Defendant cites the Declaration of Zebulan Sasse (Doc. No. 45-3), as well as an exhibit to Sasse's declaration that it states is a true and accurate copy of the subject deduct field order (Doc. No. 53 ¶ 10), Plaintiff cites the declaration of Ruple (Doc. No. 50-1), in addition to what it claim is a true and accurate copy of its accounting for its work on the Project, in support of its factual statement as to this point.

[3] While Plaintiff denies this statement, Plaintiff's only basis for denial appears to be Ruple's statement that Plaintiff "lacks knowledge regarding the identity of a third-party subcontractor who installed the . . . [p]anel [s]ystem for the Project[,]" and that Plaintiff "is still owed approximately $91,118/40 for the work it performed under the Subcontract." (Doc. No. 51 ¶ 11.)

in the balance owed by Defendant to Plaintiff decreasing by $4,500.00 to a total of $34,504.00.[4] (Id. ¶ 12.)

Subsequently, Plaintiff engaged the services of the Chagrin Valley Steel Erectors (the "Steel Erectors"), an entity owed by Ruple and his wife, Victoria, "to supply the necessary labor for completion of the Project[,]" and did so without obtaining prior, written consent from Defendant.[5] (Id. ¶¶ 13-14.) Plaintiff "hoped to secure a subsidy from the union affiliated with" the Steel Erectors, which Defendant states was to offset the costs of retaining the workers, as such a cost exceeded the lump sum contract price, but was unsuccessful in doing so.[6] (Id. ¶¶ 16-17.) Ruple testified that, after failing to obtain the subsidy, Plaintiff did not request a change order from Defendant to increase the lump sum price under the Subcontract such that Defendant would be able to choose whether to pay for the additional labor costs imposed by the retention of the Steel Erectors for work in relation to the Project. (Doc. No. 45-1 at 37:16-22.)

### 3. Submission of Time and Material Tickets

Plaintiff also maintains that it made several payment requests to Defendant "in the form of time and material tickets" through an employee of Defendant named Pat Andres ("Andres"),

---

[4] Plaintiff admits that it was paid $4,500.00 on or about June 20, 2016, but denies that the balance owed to it by Defendant at that point was $34,504.00. (Doc. No. 51 ¶ 12.)

[5] Although Plaintiff denies Defendant's factual statement as it relates to whether it obtained Defendant's prior written consent to use the work of the Steel Erectors on the Project, in doing so, Plaintiff cites only to Paragraph 5 of Ruple's Declaration (Doc. No. 53 ¶ 13), which, pursuant to the Court's Memorandum and Order as to Defendant's motion to strike entered concurrently with this Memorandum, the Court will disregard for purposes of resolving the instant motion for summary judgment. Also pursuant to the Court's Memorandum and Order disposing of Defendant's motion to strike, the Court similarly disregards Paragraph 10 of the Declaration, which states that Defendant's on-site employees were aware of the work being performed by the Steel Erectors and permitted the Steel Erectors to continue working on the Project. (Doc. No. 50-1 ¶ 10.)

[6] Plaintiff denies that the cost related to the Steel Erectors exceeded the lump sum contract price (Doc. No. 51 ¶ 16), referring to the Ruple Declaration for the proposition that these labor costs did not exceed the lump sum contract price, "as the Subcontract price converted to a [t]ime and [m]aterials [c]ontract." (Id.)

so as to cover the "extra labor costs associated with the Project from June 2016 through August 2016," and that "[a]fter making repeated payment requests, and failing to receive payment, Ruple emailed [Defendant's general counsel] Louise Decock ("Decock") on October 5, 2016 with [Plaintiff's] invoices for the Project" (Doc. No. 50-1 ¶ 13), to which Decock responded by stating that "[t]his is the first time this invoice has been received by [Defendant]" and that "[i]t is being rejected as being in excess of the agreed upon [S]ubcontract amount" (id. at 17). Despite the relevant requirements articulated in Article 6.2 of the Subcontract, Plaintiff "never obtained any written change orders executed by [Defendant's] President or Senior Vice President authorizing [such] 'extra work' or a corresponding increase in the . . . [c]ontract [p]rice." (Id. ¶ 22.) Although Plaintiff contends that it submitted "time and material tickets" regarding extra work to Andres, Ruple admitted that Andres lacked "authority to approve those time and material tickets," and that Andres never approved them in writing.[7] (Id. ¶ 23.) Further, Plaintiff proceeded with the extra work prior to submitting the subject time and material tickets to Defendant, in contravention of Article 6.2 of the Subcontract. (Id. ¶ 24.)

Additionally, Article 6.3 of the Subcontract mandates that "any disputes between Subcontractor and Contractor regarding the cost of change orders or extra work are to be submitted to the Project Architect for binding determination." (Doc. No. 53 ¶ 25) (citing Doc. No. 1-2). Ruple further testified that Plaintiff "never submitted a claim to the Project Architect concerning any dispute with [Defendant] over its total cost invoices and payment for alleged extra work." (Id. ¶ 26.) Further, "August 9, 2016 was the last day that labor, work, and/or materials were performed or delivered by [Plaintiff] for the Project." (Id. ¶ 27.)

---

[7] The Court notes that, however, Plaintiff denies a portion of Defendant's factual assertion as to this point on the basis that "[t]he parties' course of conduct reveals that [Plaintiff] sent time and material tickets to" Andres, who "authorized [Plaintiff's] work at the Project." (Doc. No. 51 ¶ 23.)

#### 4. Defendant's Payment of $34,504.00 to Plaintiff

Approximately two months later, in early October of 2016, Plaintiff "forwarded its total cost invoices to [Defendant] and (for the first time) sought payment in excess of the [l]ump [s]um [c]ontract [p]rice." (Id. ¶ 28.) Ruple testified that, after forwarding this information to Defendant via email, he received a response from Decock stating that "this is the first time this invoice has been received by [Defendant]" and that Defendant was going to reject the invoice "as being in excess of the agreed-upon subcontract amount." (Doc. No. 45-1 at 15:3-13.) Additionally, Ruple answered in the affirmative when asked whether he agreed that he "had never invoiced [Defendant] for these additional costs before October of 2016."[8] (Id. at 15:20-25, 16:1-4.)

On approximately October 20, 2016, Defendant "issued payment to [Plaintiff], in care of its attorney, by check in the amount of $34,504.00[,]" which was accompanied by a letter stating: "Enclosed please find [Defendant's] check in the amount of $34,504.00 made payable to [Plaintiff], which represents their balance due for the Dollar General Project in Cleveland, Ohio."[9] (Doc. No. 53 ¶ 30.) Plaintiff then "accepted this check, deposited it in its bank account, and . . . used the funds to pay bills and other operating expenses." (Id. ¶ 31.) Combined with Defendant's June 20, 2016 payment to Plaintiff for $4,500.00, its October 20, 2016 payment of $34,504.00 meant that Defendant paid Plaintiff a total amount of $39,004.00. (Id. ¶ 32.)

---

[8] The Court observes that in connection with this line of questioning, Ruple also stated that Plaintiff received instructions from Defendant "to run any change orders or any amounts through [Andres] before requests for change orders[,]" and, consequently, Plaintiff "couldn't invoice until we had a change order, but we never got change orders." (Doc. No. 45-1 at 15:23-25, 16:1-2.)

[9] Plaintiff does not deny this statement specifically and in accordance with the applicable local rules, stating only, instead, that it "[a]dmit[s] that Louise Decock's October 5, 2016 email speaks for itself." (Doc. No. 51 ¶ 30.) Accordingly, the Court deems the subject factual statement from Defendant admitted.

Approximately two months after depositing the $34,504.00 check from Defendant, Plaintiff sent Defendant a check for the same amount, which Defendant refused to accept. (Id. ¶ 33, Doc. No. 51 ¶ 35.) While Plaintiff admits that Defendant paid it $39,004.00, it denies that this is the total amount owed to it under the Subcontract, stating that, rather, it "is owed approximately $91,118.40 for work it performed under the Subcontract." (Doc. No. 51 ¶ 34.)

### B.   Procedural Background

Plaintiff initiated the above-captioned action against Defendant by filing a two-count complaint in this Court on January 3, 2017, asserting claims for breach of contract (Count I) and unjust enrichment (Count II).[10] (Doc. No. 1.) On March 23, 2017, Defendant filed an answer to the complaint, setting forth affirmative defenses and asserting two counterclaims against Plaintiff for breach of contract. (Doc. No. 11.) Following the completion of discovery,[11] Defendant filed the instant motion for summary judgment (Doc. No. 42), on December 7, 2017, along with a brief in support thereof (Doc. No. 44).[12] Plaintiff filed a brief in opposition to the motion on December 28, 2017 (Doc. No. 49), to which Defendant filed a brief in reply on January 15, 2018 (Doc. No. 58). Having been fully briefed, Defendant's motion is ripe for disposition.

---

[10] On September 26, 2017, the above-captioned action was reassigned to the undersigned. (Doc. No. 41.)

[11] The Court observes that the parties conducted discovery in regard to a related state action captioned Ruple Builders, Inc. v. MBC Development, Inc., and filed in the Cuyahoga County Court of Common Pleas, in Cuyahoga County, Ohio, and that, as noted by Defendant in its motion to strike and for sanctions, the parties have agreed that "all discovery obtained in that case may be used in the instant litigation." (Doc. No. 55 at 3.)

[12] As noted supra, Defendant also filed a motion to strike and for sanctions (Doc. No. 55), with respect to the Declaration of John Ruple (Doc. No. 50-1), submitted by Plaintiff in conjunction with its brief in opposition to Defendant's motion for summary judgment (Doc. No. 49). The Court addressed Defendant's motion to strike and for sanctions in a separate Memorandum and Order.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs the grant of summary judgment. Parties may move for summary judgment on particular claims or defenses, or on a part of each claim or defense. Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (citation omitted).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The non-moving party cannot rest on mere pleadings or allegations," El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001). The Court "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and will grant the motion only "if no reasonable juror could find for the non-movant." Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).

## III. DISCUSSION

### A. Applicable Legal Standards[13]

---

[13] The parties agree that Pennsylvania law governs Plaintiff's claims, and the Court analyzes the claims accordingly.

### 1.     Breach of Contract: General Principles

Under Pennsylvania law, a plaintiff must demonstrate the existence of each of the following elements to establish a breach of contract claim: "(1) the existence of a contract; (2) breach of a duty imposed by the contract; and (3) damages caused by the breach." See Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv. Co., 120 F. Supp. 3d 449, 456 (W.D. Pa. 2015) (citing Haywood v. Univ. of Pittsburgh, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013)). "Pennsylvania courts apply the 'plain meaning rule' of contract interpretation[,] which assumes that the intent of the contracting parties is embodied in the contract itself, and when the words of the contract are clear and unambiguous the intent is to be discovered only from the language in the contract." See Donau Furnier, GmbH v. M&T Veneer Corp., 715 F. Supp. 2d 604, 608 (M.D. Pa. 2010) (citing Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994)).

In instances where "the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing." See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995). Accordingly, "[o]nly where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent." See id. (citing Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994)). "Therefore, as a preliminary matter, courts must 'determin[e] as a matter of law which category written contract terms fall into – clear or ambiguous.'" Id. (alteration in original) (quoting Allegheny, 40 F.3d at 1424). "A contract is ambiguous if it is reasonably susceptible of different conclusions and capable of being understood in more than one sense." Allegheny, 40 F.3d at 1424. Further, "[t]he Supreme Court of Pennsylvania has identified two types of ambiguity: (1) patent ambiguity, and (2) latent

ambiguity." Id. As the Court of Appeals in Allegheny explained, a patent ambiguity "is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." Id. (quoting Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 1982)). "In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain[,] although the language thereof, on its face, appears clear and unambiguous." Id. (quoting Steuart, 444 A.2d at 663).

## 2. Breach of Contract: Conditions Precedent

A condition precedent is a contractual condition that "must occur before a duty to perform under a contract arises." See Am. Diabetes Assoc. v. Friskney Family Trust, LLC, 177 F. Supp. 3d 855, 877 (E.D. Pa. 2016) (citing Acme Mkts., Inc. v. Fed. Armored Exp., Inc., 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994); Boro Constr., Inc. v. Ridley Sch. Dist., 992 A.2d 208, 216 (Pa. Commw. Ct. 2010)). Compliance with all conditions precedent is required in order to establish a breach of contract claim. See, e.g., Leach v. Nw. Mut. Ins. Co., No. 01-cv-2364, 2005 WL 3533116, at *6 (W.D. Pa. Dec. 22, 2005) (citing Pierce v. Montgomery Cty. Opportunity Bd., Inc., 884 F. Supp. 965 (E.D. Pa. 1995)) (describing "fulfillment with all conditions precedent" as a prerequisite to a breach of contract claim). "While the parties to a contract need not utilize any particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." Acme Mkts., 648 A.2d at 1220 (citing Estate of Barilla, 535 A.2d 125 (Pa. Super. Ct. 1987)). "The purpose of any condition set forth in a contract must be determined in accordance with the general rules of contractual interpretation." Id.

## 3. Breach of Contract: Parties' Course of Dealing and Waiver

Pennsylvania law recognizes the concept of waiver, which is "the voluntary and intentional abandonment or relinquishment of a known right." See Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F. Supp. 2d 416, 423 (E.D. Pa. 2011) (quoting Prime Medica Assocs. v. Valley Forge Ins. Co., 970 A.2d 1149, 1156 (Pa. Super. Ct. 2009)). "To constitute a waiver of a legal right, there must be a clear, unequivocal[,] and decisive act of the party with knowledge of such right and an evident purpose to surrender it." Id. (quoting Commonwealth ex rel Corbett v. Griffin, 946 A.2d 668, 679 (Pa. 2008)). "[A] course of performance by one party accepted or acquiesced in without objection by the other may be evidence of an agreed modification or waiver of a written term." Agathos v. Starlite Motel, 977 F.2d 1500, 1509 (3d Cir. 1992).

### 4. Breach of Contract: Doctrine of Accord and Satisfaction

The doctrine of accord and satisfaction is a defense to a claim of breach of contract that may be characterized as "a substitute contract between a debtor and creditor for the settlement of a debt by some alternative performance other than full payment of the debt." See Occidental Chem. Corp. v. Envt'l Liners, Inc., 859 F. Supp. 791, 793 (E.D. Pa. 1994)). "Because an accord is a contract, it requires the elements of a contract: offer, acceptance, and consideration." Fleming v. CAN Ins. Co., 52 F. Supp. 2d 499, 502 (E.D. Pa. 1999) (citing Occidental Chem. Corp., 859 F. Supp. at 793). "The elements of accord and satisfaction are: (1) a disputed debt[;] (2) a clear and unequivocal offer of payment in full satisfaction[;] and (3) acceptance and retention of payment by the offeree." Id. (citing PNC Bank, Nat. Assoc. v. Balsamo, 634 A.2d 645, 655 (Pa. Super. Ct. 1993)). "Generally, the debtor's offer of a full payment check and the creditor's negotiation of that check constitute the offer and acceptance of an accord and satisfaction with the consideration being the resolution of an unliquidated or disputed claim." Id. (citing Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 147 (3d Cir. 1999)).

### 5.    Unjust Enrichment: General Principles

For a party to establish a successful claim for unjust enrichment under Pennsylvania law, the following elements are required: "(1) plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) acceptance and retention by the defendant of the benefits, under the circumstances, would make it inequitable for the defendant to retain the benefit without paying for the value of the benefit." See Global Ground Support, LLC v. Glazer Enters., Inc., 581 F. Supp. 2d 669, 675 (E.D. Pa. 2008).  "The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched." Id. (citing Limbach v. City of Phila., 905 A.2d 567, 577 (Pa. Commw. Ct. 2006)).  Pennsylvania courts recognize two categories of unjust enrichment claims:

> (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim.

Whitaker v. Herr Foods, Inc., 198 F. Supp. 3d 476, 492 (citing Zafarana v. Pfizer, Inc., 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010)).  "As to the first theory, an unjust enrichment claim based on a theory of quasi-contract may be pled as an alternative to a breach of contract claim." Id. at 493 (citing Lugo v. Farmers Pride, Inc., 967 A.2d 963, 970 n.5 (Pa. Super. Ct. 2009)).  "A quasi-contract theory is 'typically invoked . . . when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." Id. (second, third, and fourth alterations in original) (quoting Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999)).  Accordingly, "the doctrine does not apply where a written or express contract exists." See id. (citing Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006)).

### B.    Arguments of the Parties

### 1. Defendant's Arguments in Support of Summary Judgment

In support of its motion, Defendant asserts that it is entitled to summary judgment because: (1) as to Plaintiff's breach of contract claim, Plaintiff has been paid fully under the Subcontract and did not adhere to "the contractual conditions precedent to obtaining an increase to the lump sum contract price"; (2) Plaintiff cannot establish an unjust enrichment claim "because a written contract governs the scope of the work for which [Plaintiff] seeks additional compensation"; and (3) Plaintiff's claims are barred by operation of the doctrine of accord and satisfaction. (Doc. No. 44 at 2.)

### a. Payment to Plaintiff under the Subcontract and Plaintiff's Adherence to the Subcontract's Conditions Precedent to Obtaining an Increase in the Lump Sum Contract Price

First, Defendant argues that because the Subcontract is a "clear and unambiguous writing," the Court must construe the Subcontract as a matter of law and look only to its contents in doing so. (Id. at 5.) Additionally, Defendant argues that "[a]s originally drafted, Article 3.1 of the Subcontract required [Defendant] to pay [Plaintiff] a total sum of $57,500.00 for its work on the Project[,]" and due to another subcontractor's work performed on the Project, "this sum was reduced by field order to $39,004.00 on July 12, 2016." (Id. at 7.) According to Defendant, it then paid Plaintiff $4,500.00, upon receipt of a pay application, on June 20, 2017, and subsequently made a "final payment to [Plaintiff] in the amount of $34,504.00" on October 20, 2016, which Plaintiff accepted and deposited into its bank account. (Id.) Defendant argues that in light of the above, "[c]ombined with [its] prior payment of $4,500.00, the October 20, 2016 payment satisfied the full amount owed to [Plaintiff] under the terms of the Subcontract as modified by the July 12, 2016 field order" and because Plaintiff "has failed to comply with the

Subcontract provisions governing payment for increased costs and extra work," its breach of contract claim is meritless. (Id.)

In addition, Defendant contends that Plaintiff's "claim for over [$100,000] in extra costs is a direct result of its unilateral decision to assign its scope of work under the [p]arties' Subcontract" to the Steel Erectors, a decision made both "without obtaining [Defendant's] prior written consent" and without "a written change order [from Plaintiff] for the extra costs associated with its retention" of the Steel Erectors, in contravention of the Subcontract's express language. (Id. at 7-8.) Defendant notes that despite Ruple accepting and agreeing to these terms, Plaintiff "acknowledges that it failed to comply with the provisions of Article 6.2 before it sought an increase of the [l]ump [s]um [c]ontract [p]rice" (id. at 9), and states that, under the applicable case law, and per the requirements of Articles 12.3 and 6.2, Plaintiff "is barred from recovering for any additional costs incurred as a result of its unauthorized and unilateral assignment of work to" the Steel Erectors. (id. at 10-11). According to Defendant, despite Article 6.2's express requirements, Plaintiff failed to obtain the required change orders form Defendant's President or Senior Vice President that would have permitted payment for extra work or authorized an increase in the lump sum contract price. (Id. at 12.)

Further, Defendant asserts that "[w]hile [Plaintiff] contends that it was excused from doing so because it presented 'time and material' tickets to [Defendant's] employee Pat Andres, [Plaintiff] admits that these 'time and material' tickets were submitted after its 'extra work' was performed and were never approved in writing by [Defendant]." (Id.) Defendant cites Ruple's deposition testimony "that even if he was told to submit time and material tickets for extra work to . . . Pat Andres, the only persons who could bind [Defendant] to pay for that extra work were [Defendant's] President or Senior Vice President." (Id. at 14.) Defendant argues that "Ruple

understood that even if he was told to submit 'time and material tickets' to . . . Andres, those tickets would have to be submitted by Mr. Andres to [Defendant's] home office for approval in accordance with the Subcontract."  (Id. at 15.)  Defendant asserts that, therefore, "the provisions of the Subcontract requiring prior, written approval for extra work" preclude Plaintiff from establishing a viable breach of contract claim.  (Id.)

### b.      Plaintiff's Unjust Enrichment Claim

Defendant also moves for summary judgment on Plaintiff's unjust enrichment claim. According to Defendant, Plaintiff "has expressly alleged in its [c]omplaint that the [p]arties entered into a binding, written contract" and Plaintiff "admits that this contract fixed the value of the services rendered by [Plaintiff], including all labor, materials, and supervision necessary to erect a pre-engineered metal building system at the Project site."  (Id. at 16.)  In sum, Defendant asserts that "[b]ecause the [p]arties' Subcontract precludes [Plaintiff's] attempt to recover under a quasi-contractual theory, its claim for unjust enrichment should be dismissed as a matter of law."  (Id.)

### c.      Applicability of the Doctrine of Accord and Satisfaction

Finally, Defendant maintains that when it sent Plaintiff a check for $34,504.00 with the notation that it was to be "made payable to [Plaintiff], which represents their balance due for the . . . Project[,]" and Plaintiff accepted and deposited the check in its bank account, the parties' actions "constitute[d] a binding accord and satisfaction" warranting the entry of summary judgment in Defendant's favor on Plaintiff's claims.  (Id. at 16-17.)  Defendant specifically asserts that the elements required for the application of accord and satisfaction are present in the instant case because: (1) at the time Defendant made this payment, the parties "disputed that amount owed for [Plaintiff's] services on the Project"; (2) Defendant subsequently mailed a

check to Plaintiff with a cover letter explaining that the payment was to represent the balance due; and (3) Plaintiff accepted Defendant's check, deposited the payment in its bank account, and used the funds "to pay its own bills and operating expenses."[14] (Id. at 17.) Defendant asserts that, "in the event the Court does not find that [Plaintiff's] claims are barred as a matter of law by the clear and unequivocal terms of the [p]arties' Subcontract, they are certainly precluded under the doctrine of accord and satisfaction." (Id. at 18.)

### 2. Plaintiff's Arguments in Opposition to Summary Judgment

Plaintiff argues that Defendant is not entitled to summary judgment on either of its claims because: (1) Plaintiff has not been paid in full and the parties waived the Subcontract's conditions precedent to obtaining an increase in the lump sum contract price; (2) Plaintiff is entitled to equitable relief in the form of its unjust enrichment claim, in addition to the relief sought in its claim for breach of contract; and (3) it is not barred from recovery by operation of the doctrine of accord and satisfaction. (Doc. No. 49 at 2.)

### a. Plaintiff's Payments under the Subcontract and Waiver of Certain Conditions Precedent

Plaintiff initially argues that "it is clear that there was ambiguity between what was written in the Subcontract regarding [Plaintiff's] submission of costs for extra work and labor and the instructions that [Defendant] gave [Plaintiff] in the field." (Id. at 7-8.) Plaintiff states

---

[14] Defendant adds that, under the applicable case law, "[t]he fact that [Plaintiff] attempted to pay [Defendant] back over two months later . . . does not alter the conclusion that [Plaintiff] accepted and retained [Defendant's] final payment." (Doc. No. 44 at 18.) Further, Defendant states that Plaintiff's "attempt to undo the [p]arties' accord and satisfaction by sending [Defendant] a return check . . . over two months after it negotiated [Defendant's] original check was ineffectual" in that "[n]ot only did [Defendant] promptly reject [Plaintiff's] return draft, but [Plaintiff] had already negotiated [Defendant's] October 20, 2016 check and commingled [Defendant's] payment with its other assets." (Id.) According to Defendant, therefore, Plaintiff "did not return [Defendant's] check without using it, such that a reasonable trier of fact could conclude that no accord and satisfaction occurred." (Id.) (internal quotation marks omitted).

that while Article 6.2 required change orders to be approved and signed in writing by Defendant's President or Senior Vice President, "the parties' course of dealing was just the opposite[,]" in that Plaintiff "was instructed by [Defendant] to send change orders and requests for extra work and labor costs through . . . Andres." (Id. at 8.) Plaintiff further states that, "[a]ccordingly, since a significant ambiguity existed between the terms of the Subcontract and the parties' conduct, parol evidence must be admissible to explain said ambiguity" and, "[m]oreover, any ambiguity must be construed against [Defendant]," which warrants the denial of Defendant's motion. (Id. at 9.)

In addition, Plaintiff argues Defendant "has failed to pay [Plaintiff] all money owed under the Subcontract and the conditions precedent to [Plaintiff] receiving payment were discharged on account of [Defendant's] anticipatory repudiation." (Id.) Plaintiff states that "[t]hus, [Defendant] unequivocally refused to pay [Plaintiff] for its extra work and labor costs . . . [and] because of [Defendant's] anticipatory breach, the alleged failures of [Defendant] to comply with Article 6.2 are discharged and [Plaintiff] is entitled to full payment . . . under the Subcontract." (Id. at 10.) Further, Plaintiff states that although the Subcontract, "as originally drafted," required Defendant "to pay Plaintiff $57,700 for its work at the Project[,]" the Subcontract was subsequently "converted to a Time and Material Contract, and accordingly, the $57,700 price was eliminated[,]" meaning that, as a result, Plaintiff "has not been paid all money owed to it under the Subcontract."[15] (Id.)

Plaintiff further asserts that it "detrimentally relied upon Pat Andres' statements in the field to proceed with extra work and because Articles 6.2 and 12.3 [of the Subcontract] were waived." (Id. at 10-11.) Plaintiff specifically argues, inter alia, that it "is owed approximately

---

[15] Plaintiff states that "[i]n fact, [it] is still owed approximately $91,118.40." (Id. at 10.)

$91,118.40 [due to its performance of] extra work that was authorized by Andres, and [it] will suffer severe injustice and prejudice if [Defendant] does not pay for work performed at its verbal direction." (Id. at 12-13.) Additionally, Plaintiff maintains that Defendant "knew that [Plaintiff] had assigned the labor to" the Steel Erectors, and "[t]his is because [Defendant] had written knowledge of [Plaintiff's] intent to subcontract the labor . . . before the Subcontract was signed." (Id. at 13.) Accordingly, Plaintiff contends that, in light of the above, Defendant "cannot attempt to argue that it lacked written or actual notice" of this work being performed. (Id.)[16]

Furthermore, Plaintiff asserts that the parties waived the relevant conditions precedent, as set forth in Article 6.2 of the Subcontract (id. at 14), as a result of Defendant's "intentional, clear[,] and concise statements . . . that [Plaintiff] needed to send change orders and requests for extra work and labor costs to Andres" (id. at 15). According to Plaintiff, "when the Subcontract converted to a [t]ime and [m]aterials contract[,] . . . Andres never rejected [Plaintiff's] time and material tickets or stated that [Defendant] rejected [the tickets]," but, rather, "authorized [Plaintiff] to proceed with extra work at the Project." (Id.) Plaintiff states that these statements demonstrate the existence of a genuine dispute of material fact and, therefore, render summary judgment for Defendant improper.

### b. Plaintiff's Ability to Pursue Equitable Relief Through its Unjust Enrichment Claim

---

[16] Plaintiff further asserts that the parties waived Article 6.2 of the Subcontract's written change order provision in that "Andres was [Defendant's] on-site employee who observed and directed [Plaintiff] to perform extra work[,]" and that Plaintiff relied upon these directives, in addition to statements from Andres that Plaintiff "would be paid for any change orders and requests for extra work that [Plaintiff] submitted" through Andres. (Id. at 13.) According to Plaintiff, "the only logical conclusion is that because Andres verbally authorized the extra work and was on site to see [Plaintiff] and/or . . . [the] Steel Erectors perform the work," Defendant must pay Plaintiff for this work. (Id.)

Plaintiff also contends that despite Defendant's emphasis on "the presence of the Subcontract[,]" Plaintiff "is permitted to seek and ask this Court for an equitable remedy as a separate cause of action" in light of the Court's "power to render an equitable decision." (Id. at 17.) Plaintiff further argues that it has met its burden in establishing the elements of an unjust enrichment claim because: (1) Plaintiff "completed its work at the Project on August 9, 2016 and made repeated requests for payment"; (2) Defendant "knew that [Plaintiff] completed its work at the Project and repeatedly failed to pay [Plaintiff] for its work"; and (3) permitting Defendant "to retain the benefits of [Plaintiff's] work without [Plaintiff] being compensated in full" would result in a manifest injustice. (Id.) Defendant states that, because it can meet these elements, it is entitled to "approximately $91,118.40 for work performed under the Subcontract." (Id. at 18.)

### c. Applicability of the Doctrine of Accord and Satisfaction

In addition, Plaintiff maintains that its claims against Defendant are not barred by the doctrine of accord and satisfaction. (Id.) Noting that for the doctrine to be applicable, "the payment must be tendered in good faith," Plaintiff states that under the governing law, it is not precluded from asserting the instant claims against Defendant because Defendant "did not tender the $34,504 check to [Plaintiff] in good faith[,]" but, rather, did so "on the advice of counsel" who knew that Plaintiff "needed to be paid for its work and purposefully and deceitfully sent [Plaintiff] a check . . . so that it could utilize an accord and satisfaction defense in this lawsuit and avoid paying [Plaintiff] for its extra costs."[17] (Id.) According to Plaintiff, when it deposited the check into its bank account, it did so "without accepting it as the final payment owed to it

_____

[17] Plaintiff also states that Defendant, by way of communication between counsel for both parties, "knew that [Plaintiff] was in a desperate financial situation on account of being owed over $100,000 for work performed under the Subcontract and [could not] continue to operate its business without depositing the $34,504 check." (Id. at 18-19) (citing Paragraph 16 of Ruple's Declaration).

under the Subcontract" and subsequently mailed Defendant a check in the amount of $34,504 approximately two months after receiving the initial check from Defendant.  (Id. at 19.)  Plaintiff argues that, consequently, the third element necessary to invoke the doctrine of accord and satisfaction – acceptance and retention of payment by the offeree – is not met because Plaintiff never accepted the subject check from Defendant as a final payment under the Subcontract.[18] (Id.)

### C.    Whether Summary Judgment in Favor of Defendant is Proper

#### 1.    Plaintiff's Breach of Contract Claim

Having considered the undisputed facts and relevant evidence of record, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's breach of contract claim on the basis that Defendant's payment of $34,504.00, and Plaintiff's acceptance thereof, amounted to a valid accord and satisfaction.  As an initial matter, the Court observes that the undisputed facts and evidence of record reveal that prior to Defendant sending said check to Plaintiff, there was an "actual and substantial difference of opinion as to the amount due" under the Subcontract, as evidenced by the email exchange between the parties as to the relevant invoices, which the Court finds sufficient to satisfy the "disputed debt" element of an accord and satisfaction.  See Fleming, 52 F. Supp. 2d at 502.  Furthermore, while Plaintiff argues at length that the parties' alleged course of dealing, including its interactions with Andres, permitted Plaintiff to act in contradiction of the express requirements of the Subcontract, it is undisputed that in October of 2016, Defendant sent Plaintiff a check for $34,504.00, and in doing so, represented that the check represented Defendant's balance due in relation to the Project.  (Doc.

---

[18] As to the applicability of the doctrine of accord and satisfaction, Plaintiff advances an additional argument that because Defendant "submitted a check in the amount of $34,504 and not $91,118.40, there cannot be an accord and satisfaction."  (Id. at 19.)

Nos. 43 ¶ 30, 45-2 at 18-20.) Such an act establishes an "offer" required to establish the existence of an accord and satisfaction. See, Occidental Chem. Corp., 859 F. Supp. at 793 (concluding that the elements of an accord and satisfaction were met and noting that one party "made an offer by sending a check which was clearly marked 'final payment' along with a letter which expressly stated that the check represented all outstanding monies owed").

Lastly, the Court concludes that Plaintiff accepted this offer from Defendant when it deposited the check, notwithstanding Plaintiff's arguments that it was motivated to do so only by its precarious financial situation. Most significantly, after receiving the check and its accompanying letter indicating Defendant's intent for it to represent the balance due, Plaintiff admittedly deposited the check into its bank account. (Doc. No. 45-2 at 7:4-12.) See Occidental Chem. Corp., 859 F. Supp. at 793 (reasoning that the acceptance element of an accord and satisfaction as present when one party "[b]y negotiating the check . . . accepted [the other party's] offer to settle the dispute"); see also Bayside Chrysler Plymouth Jeep Eagle, Inc. v. Ma, No. DC-9699-02, 2006 WL 1449783, at *8 (N.J. Super. Ct. App. Div., May 26, 2006) ("[W]hen a check bears a notation indicating that it is being tendered in full satisfaction of the disputed debt, we impute to the creditor an intent to be bound by the amount of the check if the creditor deposits the check for collection, notwithstanding [that] the deposit is made under protest." (quoting Zeller v. Markson Rosenthal & Co., 691 A.2d 414, 463-44 (N.J. Super. Ct. App. Div. 1997)) (internal quotation marks omitted)).[19] Additionally, while Plaintiff attempted to repay

---

[19] While the court in Bayside analyzed the applicability of the doctrine of accord and satisfaction under New Jersey law, the elements recognized by the court are functionally identical to those necessary for the doctrine to apply under Pennsylvania law. See Bayside Chrysler Plymouth Jeep Eagle, Inc. v. Ma, No. DC-9699-02, 2006 WL 1449783, at *7 (N.J. Super. Ct. App. Div., May 26, 2006). The Court finds the reasoning in Bayside applicable to the case at bar, and is persuaded that despite Plaintiff's arguments that it deposited Defendant's check for $34,504.00 due to its troubled financial situation, in depositing the check and making use of the funds

Defendant the $34,504.00 and reject the check from Defendant it previously received in that amount, the Court observes that Defendant did so approximately two months after receiving the initial check from Defendant and depositing the check. (Doc. No. 45-2.) In light of such facts, the Court concludes that this case is far from one in which a party explicitly rejects the other party's offer and, consequently, negates the possibility of an accord and satisfaction. Contra Fleming, 52 F. Supp. 2d at 502 (finding that an accord and satisfaction was not established and reasoning that "some four days before the check was cut, plaintiff's attorney had specifically advised defense counsel that plaintiff would be pursuing . . . a claim . . . and that any check which was submitted as 'full payment or the equivalent thereof,' would be cashed without waiver of these rights"). Accordingly, because the Court concludes that, based on the undisputed facts and relevant evidence of record, an accord and satisfaction occurred, the Court will grant Defendant's motion for summary judgment (Doc. No. 42), as to Count I of Plaintiff's complaint (Doc. No. 1).[20]

### 2. Plaintiff's Unjust Enrichment Claim

---

acquired therefrom, Plaintiff indeed "accepted" Defendant's offer of payment so as to establish the acceptance element of an accord and satisfaction.

Further, to the extent Plaintiff's arguments on this point may be interpreted as a claim that it deposited the check involuntarily, the Court finds such an argument insufficient to warrant denial of Defendant's motion because the undisputed facts and relevant evidence of record do not establish that Plaintiff provided Defendant with any "notice that it was accepting the check under protest or duress." See Goodway Mktg., Inc. v. Faulkner Advert. Assocs., Inc., 545 F. Supp. 263, 267 (E.D. Pa. 1982) (concluding that evidence established accord and satisfaction as matter of law).

[20] The Court also notes that, even in the absence of an accord and satisfaction, Plaintiff's breach of contract claim fails as a matter of law because Plaintiff has failed to adduce sufficient evidence of record to demonstrate a genuine dispute of material fact as to this claim. It bears noting that, in opposing Defendant's arguments in support of summary judgment on Plaintiff's breach of contract claim, Plaintiff essentially relies on the paragraphs of the Ruple Declaration that the Court concluded should be disregarded for purposes of resolving the instant motion for summary judgment, as explained more fully in its Memorandum and Order disposing of Defendant's motion to strike and for sanctions.

The Court also concludes that, notwithstanding the Court's conclusion, as explained supra, regarding the applicability of the doctrine of accord and satisfaction to Plaintiff's breach of contract claim, Plaintiff's unjust enrichment claim fails as a matter of law based on the existence of a written agreement. Despite Plaintiff's contention that it remains entitled to pursue equitable relief in the form of its unjust enrichment claim, Plaintiff ultimately does not dispute the existence of a written agreement, the Subcontract. (Doc. No. 51.) Consequently, Plaintiff cannot meet its burden in establishing a claim for unjust enrichment. See, e.g., Lackner, 892 A.2d at 34 ("By its nature . . . unjust enrichment, is inapplicable where a written or express contract exists."); see also, e.g., SodexoMAGIC, LLC v. Drexel Univ., __ F. Supp. 3d __ (E.D. Pa. 2018) (acknowledging that the quasi-contract form of unjust enrichment is generally invoked as an alternative to a breach of contract claim). The Court, therefore, will grant Defendant's motion for summary judgment (Doc. No. 42), as to Count II of Plaintiffs' complaint (Doc. No. 1).

### D. Defendant's Counterclaims

The Court also observes that in answering Plaintiff's complaint on March 23, 2017, Defendant asserted two counterclaims for breach of contract against Plaintiff (Doc. No. 11 at 6-8), to which Plaintiff responded on March 24, 2017 (Doc. No. 14). As to the first counterclaim, Defendant avers that "[f]rom the time [Plaintiff] began performing its work under the Subcontract, problems arose with the quality of [Plaintiff's] work" and that, for example, Plaintiff "repeatedly stated that it was unfamiliar with the building it agreed to erect even though it previously held itself out as an experienced building erector." (Id. ¶ 11.) Defendant also states that, "[a]mong other things, [Plaintiff] refused to install [a panel system] as required by the [S]ubcontract[,]" and that as a result, Defendant entered the deduct field order for $18,496.00

after arranging for a third-party subcontractor to install the panel system. (Id. ¶ 16.) Additionally, Defendant asserts, inter alia, that Plaintiff filed a $129,611.63 mechanic's lien in state court in Ohio "despite having been paid in full for the work it performed pursuant to the terms of the [S]ubcontract[,]" and that Plaintiff "has failed or refused to release its frivolous and fraudulent lien, causing [Defendant] to incur ongoing legal fees and damaging [Defendant's] relationship with the Project owner." (Id. ¶¶ 21-22.)

In support of its second counterclaim for breach of contract, Defendant asserts that despite the requirement in Article 12.3 of the Subcontract that Defendant approve the assignment of work to any subcontractor by providing written consent, Plaintiff "hired a third party to perform all of the work it subcontracted to perform on the Project, despite being prohibited from doing so by the terms of the Subcontract" and that Defendant "was unaware of and did not authorize the work to be performed by any subcontractor other than [Plaintiff]." (Id. ¶¶ 26-28.) Defendant further alleges that: (1) due to Plaintiff's "breach of contract in subcontracting its work to a third party[,]" Defendant has "incurred and continues to incur costs in defending the fraudulent mechanic's lien" that has harmed Defendant's relationship with the project owner, and (2) the damage to this relationship has caused Defendant to experience a "loss of future business and profit." (Id. at 9.)

The Court observes that although neither party has moved for summary judgment on the counterclaims, Federal Rule of Civil Procedure 56(f)(1) authorizes a court to grant summary judgment sua sponte in certain instances, and courts have recognized the propriety of doing so in circumstances "when there is a fully developed record, a lack of prejudice to the parties, and a decision on a purely legal issue." See Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, No. 16-cv-4850, 2018 WL 6173372, at *7 (E.D. Pa. Nov. 26, 2018) (citing Gibson v. Mayor & Council of

City of Wilmington, 355 F. 3d 215, 223-24 (3d Cir. 2004)). It is, however, "preferable for the [d]istrict [c]ourt to give notice to the parties when it is considering a sua sponte grant of summary judgment because of the potential consequences such a grant may engender." See Gibson, 355 F. 3d at 225. While the Court is inclined to consider the possibility of entering summary judgment in favor of Defendant on its counterclaims sua sponte in light of its discussion of Plaintiff's claims herein, the Court finds that, at this juncture, it is appropriate not only to provide Plaintiff, as the counterclaim-defendant, with notice and an opportunity to respond, but also to direct the parties to address specifically the impact of the Court's disposition of Defendant's motion for summary judgment (Doc. No. 42), on the two pending counterclaims.

## IV.    CONCLUSION

Based on the foregoing, the Court will grant Defendant's motion for summary judgment. (Doc. No. 42.) An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Western District of Pennsylvania
*Sitting by designation*